UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CRIMINAL ACTION NO. 4:20-CR-00013-JHM**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**V.**

**MICHAEL M. FAIRROW, JR.**                                       **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Michael Fairrow's Motion to Suppress Evidence. [DN 16]. The Court held an evidentiary hearing and the parties submitted post-hearing briefs. For the following reasons, Defendant's Motion to Suppress is **GRANTED**.

### I. BACKGROUND

On the afternoon of June 25, 2020, emergency dispatchers in McLean County, Kentucky, received a 911 call about an unconscious man in a black vehicle on a rural two-lane highway. [Hearing Transcript, DN 19 at 28:3]. Dispatchers paged out the call on the countywide radio system, asking for a medical wellness check. [*Id*. at 36:1–2]. The first two responders were Logan Vaught and Coy Murphy, volunteer firefighters for the town of Beech Grove (a small town in McLean County). They were working together on a chicken farm at the time of the call, so they drove to the scene in one vehicle. [*Id*. at 4:5–9]. When they arrived, Vaught and Murphy spotted a black vehicle parked on the northbound shoulder of the rural road. [*Id*. at 28:18]. They parked on the southbound shoulder and Murphy, a licensed EMT, approached the black vehicle. [*Id*. at 10:15–17; 28:24–25; 35:9–14]. The individual in the black vehicle was Michael Fairrow, the defendant in this case.

1

Murphy found Fairrow "alert and oriented" in the black vehicle. [*Id.* at 29:2–3]. Murphy told Fairrow he was there for a wellness check. Pursuant to his EMT training, Murphy then administered an oral medical screening to check Fairrow's cognitive functioning. [*Id.* at 29:2–4]. He determined Fairrow was fully alert and was not slurring words. [*Id.* at 29:5–6]. Fairrow told Murphy he felt fine, and he appreciated the medical check. [*Id.* at 29:7–8]. Murphy had no cause for concern. [*Id.* at 29:9–11].

While Murphy administered the medical screening, a brigade of other first responders was in route: more volunteer firefighters, an ambulance, and at least three police officers. Murphy was about to call them off after administering the screening because he saw no reason for further action, but he delayed the call when Fairrow, after the completion of the screening, got out of his car and "did a little shuffle" to prove he felt fine. [*Id.* at 29:9–23]. This struck the first responders as "odd and neurotic." [*Id.* at 5:8–11]. So, Murphy asked Fairrow to stick around until the ambulance arrived, so the ambulance could "sign off" on Fairrow's condition and "move[ ] the liability" from Murphy to the ambulance. [*Id.* at 31:7–14]. Fairrow initially complied. But while they were waiting, Fairrow heard that police officers were also in route. He "got kind of antsy" and wanted to leave. [*Id.* at 31:15–18].

Around that time, Michael Wahl, another Beech Grove volunteer firefighter, arrived on scene. [*Id.* at 40:3–9]. Wahl walked across the road to Fairrow's vehicle and talked to Fairrow while they waited for the ambulance. Wahl thought Fairrow "seemed nervous" during their conversation. [*Id.* at 43:21]. Wahl repeatedly asked Fairrow to wait for the ambulance, which Fairrow initially did. [*Id.* at 40:8–9]. But the police officers arrived simultaneous with the ambulance, spooking Fairrow. [*Id.* at 40:10–12]. He started to drive away. [*Id.* at 40:13].

Fairrow had a clear path in front of his vehicle when he started to drive away, [*id*. at 24:4–6; 38:6–8], but there were several firefighters close to the car: Wahl stood near the drivers' side window (in the road), Vaught and Murphy stood near the rear of the car, and a fourth firefighter stood next to the guardrail, near the front passengers' side window. [*Id*. at 23:24–24:3; 32:15–21]. Fairrow's sudden departure alarmed the firefighters—Vaught and Murphy jumped back, and the fourth firefighter stepped away toward the guardrail. [*Id*. at 38:9–11; 47:16–17]. Wahl, however, moved forward. As Fairrow began to drive away, Wahl dove headfirst into Fairrow's rolled-down drivers' side window. [*Id*. at 40:13–14]. Wahl's entire torso entered Fairrow's car, such that only his legs were sticking out the window. He reached across Fairrow's lap and tried to wrestle the gear shift back into park. [*Id*. at 41:20–23]. He succeeded, but Fairrow succeeded in wrestling the gear shift back to drive. Wahl wrestled it back into park, and they went back and forth a few times. [*Id*.]. He testified that he did this because he wanted to "stop the car from possibly hitting one of [the firefighters], because at that time I still did not really know the state of [Fairrow's] condition." [*Id*. at 41:7–10].

Simultaneously, the police officers (whose arrival spooked Fairrow) exited their car and walked toward Fairrow's vehicle. [*Id*. at 52:2–4]. They heard the commotion and looked up—they saw Wahl's feet hanging out the window and the vehicle jerking back and forth. [*Id*. at 52:5–10]. Recognizing the emergency, the officers sprang into action. They ran back to their police car and pulled it horizontally across the two-lane road to block Fairrow's vehicle from leaving. [*Id*. at 53:19–21; 80:21–24]. They then exited the police car and ran toward Fairrow's vehicle: one officer opened Fairrow's passenger door and jumped in the passenger seat to turn off the engine. [*Id*. at 80:25–81:2]. The other officer went to the driver's side to assist Wahl out of the window and get Fairrow out of the vehicle. [*Id*. at 81:3]. Both officers immediately smelled marijuana.

3

[*Id*. at 54:10–12; 81:5–6 (one officer stating that "the odor of marijuana just almost hit me in the face" as soon as they got Fairrow out of the vehicle)].

Once the situation subsided and Fairrow had exited, the officers searched the vehicle. The officers determined the marijuana smell gave them probable cause to search the vehicle. [*Id*. at 84:16–17]. The search revealed five bags of methamphetamine and a loaded nine-millimeter handgun in a backpack in the back seat. [*Id*. at 84:20–23; 85:9–15; 85:21–24]. The officers immediately placed Fairrow under arrest. [*Id*. at 86:13–16].

A federal grand jury indicted Fairrow for possession with intent to distribute methamphetamine, unlawful possession of a firearm, and possession of a firearm in furtherance of a drug trafficking crime. [DN 1]. Ahead of trial, Fairrow moved to suppress all evidence gathered at the scene that day. [DN 16]. The Court held an evidentiary hearing on May 12, 2021 [DN 19], and the parties filed post-hearing briefs. [DN 21, 22, 23]. After considering the post-hearing briefs, the Court ordered additional briefing on whether suppression is the appropriate remedy in this case if the Court were to find a Fourth Amendment violation. [DN 24]. The parties filed the additional briefs. [DN 28, DN 29, DN 30, DN 31].

## II. STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Evidence obtained in violation of a defendant's constitutional rights bars the use of that evidence against him at trial. *Mapp v. Ohio*, 367 U.S. 643 (1961). A person who claims to have been aggrieved by an unlawful search or seizure bears the

initial burden of production and persuasion to suppress evidence. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). Once the defendant has made a prima facie showing, the government then has the burden of demonstrating by a preponderance of the evidence that the search or seizure was not a constitutional violation. *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005).

### III. DISCUSSION

This case hinges on a single moment: the moment when Firefighter Wahl dove headfirst into Fairrow's moving car to prevent Fairrow from leaving the scene. For the reasons explained below, that action violated the Fourth Amendment.

#### A. State Action & Seizure

The Court begins with two undisputed premises. First, the volunteer firefighters, including Firefighter Wahl, were state actors subject to the Fourth Amendment. *Michigan v. Tyler*, 436 U.S. 499, 504–06 (1978) ("[T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman . . . ."). Second, Wahl seized Fairrow when Wahl dove headfirst into the vehicle and wrestled to put it in park. *See* U.S. CONST. amend. IV (guaranteeing the right of an individual to be free from "unreasonable . . . seizures"); *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized . . . when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement."); *United States v. Jones*, 562 F.3d 768, 772–73, 773 n.2 (6th Cir. 2009) (police officers seized a person when they blocked in the person's car because "the officers' conduct communicated to a reasonable occupant of the [car] that he or she was not free to drive away").

Because Wahl was a state actor who seized Fairrow, the seizure violates the Fourth Amendment if it was not "reasonable." *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("The Fourth Amendment prohibits unreasonable searches and seizures by the Government . . . .")

(quotation omitted). A seizure is presumptively unreasonable unless accompanied by a warrant and probable cause of a criminal violation. *See Jones*, 562 F.3d at 772 ("A warrantless seizure is presumptively unreasonable"). Wahl had no warrant, and as a firefighter he lacked power to arrest Fairrow for suspected criminal wrongdoing. [DN 19 at 40:19–22]. Thus, the Fourth Amendment renders Wahl's seizure unreasonable unless an exception to the Fourth Amendment's warrant and probable cause requirements applies to the situation here.

### B. Community Caretaking Doctrine

The Government hangs its hat on a single exception: the community caretaking doctrine. The community caretaking doctrine provides that law enforcement[1] do not need a warrant or probable cause for a search or seizure if they are "engaged in a function that was completely divorced from a criminal investigation." *United States v. Lewis*, 869 F.3d 460, 462 (6th Cir. 2017); *see Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The doctrine recognizes that "police officers perform many civic tasks in modern society" unrelated to fighting crime, *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021), and it is inappropriate to require a warrant and probable cause for those civic "community caretaking" activities.

The community caretaking doctrine, however, is not a blank check for government intrusions into individual liberties. Even if a government official performs a function "divorced from a criminal investigation," the search or seizure still violates the Fourth Amendment if it is not reasonable. *See Lewis*, 869 F.3d at 463 (analyzing both whether an officer was validly engaged in a community caretaking function and whether a resulting search was reasonable as an exercise

---

[1] It is not clear that the community caretaking doctrine applies to non-law enforcement officials, *see Cardenas v. Collins*, No. 15-cv-880, 2017 WL 3167659, at *7 (D.N.M. June 9, 2017) ("Neither the cases cited by the parties nor a search of the caselaw by the Court indicate that the community caretaker doctrine applies to non-law enforcement officers such as EMTs."), though the Sixth Circuit has implied that it does, *Taylor v. City of Saginaw*, 922 F.3d 328, 334–36 (6th Cir. 2019) (considering the doctrine's application to parking enforcement officials). Nonetheless, both parties proceed as if community caretaking applies to the firefighters' actions. Given the resolution of this issue, the Court need not definitively decide this question.

of that community caretaking function). The Fourth Amendment's reasonableness requirement means that "the circumstances, viewed objectively, [must] justify the action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis omitted) (alteration adopted). A community caretaking function objectively justifies a search or seizure if there are "specific and articulable facts" creating a public-safety need. *United States v. Chavez*, 985 F.3d 1234, 1244 (10th Cir. 2021); *Castagna v. Jean*, 955 F.3d 211, 222 (1st Cir. 2020); *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014). In the Sixth Circuit, the community caretaking doctrine applies only if "delay [in obtaining a warrant] is reasonably likely to result in injury or ongoing harm to the community at large." *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (quoting *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009)).

Wahl's actions did not implicate the Fourth Amendment until the moment Fairrow attempted to drive away. For the first several minutes that the firefighters were on scene, Fairrow voluntarily interacted with them. This consensual interaction does not implicate the Fourth Amendment. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (a consensual encounter "may be initiated without any objective level of suspicion"). That changed when Fairrow attempted to drive away, and Wahl dove into his vehicle to stop him. That was a seizure. Both parties agree that Wahl was attempting to exercise a community caretaking function at that time. But to satisfy the Fourth Amendment, the seizure still needed to be reasonable.[2] This means that Wahl needed "specific and articulable facts" of a public-safety need. *Chavez*, 985 F.3d at 1244; *Castagna*, 955 F.3d at 222; *Harris*, 747 F.3d at 1017.

---

[2] The Government buried its head in the sand on the reasonableness requirement entirely. Its post-hearing brief claimed the community caretaking doctrine justified Wahl's actions solely because Wahl acted for a medical purpose. [DN 22 at 5–6]. But the Fourth Amendment's reasonableness requirement does not go away simply because a government official acts for a non-law enforcement purpose. *See generally Kentucky v. King*, 563 U.S. 452, 459 (2011) (recognizing that the Fourth Amendment "expressly imposes" a requirement that "*all* searches and seizures must be reasonable") (emphasis added).

7

Here, Wahl lacked any specific and articulable facts[3] that Fairrow would be dangerous to himself or others, so his decision to jump headfirst into Fairrow's car was not reasonable. Simply put, the record does not substantiate Wahl's concerns that Fairrow was not safe to drive and would hit first responders on the scene if he attempted to drive from the scene. [DN 19 at 41:7–11 ("I jumped through the window to stop the car from . . . possibly hitting one of [the first responders], because at that time I still did not really know the state of [Fairrow's] condition. I didn't know if he was going to be safe to drive or not.")].

First, the scene was not so congested that Fairrow's driving posed an obvious threat to other people. Fairrow was on the shoulder of a rural country road. The ambulance and police officers were arriving but remained about thirty yards from Fairrow's vehicle. [*Id*. at 57:21–22]. The four firefighters were the only people close to Fairrow's vehicle when he tried to drive off. Wahl was on the drivers' side, Murphy and Vaught stood near the back, and a fourth firefighter stood off the passengers' side. [*Id*. at 23:24–24:3; 32:15–21]. Importantly, however, *no one was standing directly in front of the vehicle*. [*Id*. at 24:4–6; 38:6–8]. Fairrow had a clear path when he drove forward. The firefighters were close enough that the sudden movement startled them: the firefighter on the front passenger side stepped backward (toward the guardrail), and Murphy and Vaught jumped backward in surprise. [*Id*. at 47:5–18]. But Fairrow was not driving toward

---

[3] The parties do not identify the factual certainty required to render a seizure reasonable for a medical purpose. The Sixth Circuit has suggested that probable cause may be required: "The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). However, no court has applied *Monday* in a criminal suppression context, so it is not clear whether *Monday*'s probable cause standard applies on the facts here, or whether some lesser level of suspicion (perhaps reasonable suspicion) would suffice. But the Court need not parse those precedents. To resolve this case, it is enough to say that the law requires *some* level of particularized suspicion that an individual will be "dangerous to himself or others" before state officials can seize a person for a medical purpose consistent with the Fourth Amendment. *See id*.; *see also Lewis*, 869 F.3d at 463 (analyzing both whether an officer was validly engaged in a community caretaking function *and* whether a resulting search was reasonable as an exercise of that community caretaking function); *Chavez*, 985 F.3d at 1244 (stating that "specific and articulable facts" supporting the community caretaking function are required); *see also United States v. Greene*, _ F. App'x _, 2021 WL 3199239, at *3 (6th Cir. 2021) (the community caretaking doctrine justified a search when an officer "*reasonably* initiated the search" for a community caretaking function).

8

the passenger side firefighter (who had moved close to the guardrail), nor was he moving in reverse (which would have posed a danger to Murphy and Vaught)—he was moving toward the road, trying to leave. And Fairrow traveled some distance, perhaps as much as twenty feet, before Wahl dove in and stopped the car. [*Id*. at 37:20–25]. The fact that Fairrow traveled up to twenty feet without hitting anyone suggests that Wahl's concern about him immediately hitting someone, though perhaps honestly held, was not reasonable. The immediate danger that Fairrow would hit the firefighters had subsided. And though there were other people in the area, nothing indicates that Fairrow's attempt to drive away posed an immediate danger to any of them.

Second, Firefighter Wahl's concern about Fairrow's fitness to drive also was not objectively reasonable—the circumstances suggested Fairrow was fine to drive. Murphy, a trained EMT, was the first person on scene—he performed an oral medical screening on Fairrow and spoke with him extensively. [*Id*. at 28:17–19; 35:9–14]. Murphy testified that Fairrow passed the medical screening: he was "alert to person, place, time, and event," was not slurring words, and told the responders he was fine. [*Id*. at 29:2–4]. Murphy had no objective reason to doubt Fairrow's fitness. Also, though the original 911 caller believed Fairrow was unconscious, Fairrow rolled down his car window and engaged with Murphy within seconds of Murphy's arrival, casting doubt on the caller's claim. [*Id*. at 17:8–10].[4]

To be sure, Wahl arrived after Murphy finished the medical screening, so it is not clear how much information Murphy conveyed to Wahl about Fairrow's condition. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (stating that the Fourth Amendment reasonableness requirement looks

---

[4] Fairrow's only action that gave the firefighters any pause was when Fairrow got out of his car after Murphy finished his medical screening and shuffled around in an attempt to prove that he was alright. [*Id*. at 29:12–18]. The Government does not rely on this in its post-hearing brief, and for good reason. The firefighters described Fairrow's shuffle as "very odd," "neurotic," and "nervous," but never suggested it gave them reason to doubt Fairrow's *medical capacity*. [*Id*. at 5:10; 30:14; 44:17–18]. The Government cites no precedent suggesting medical personnel can seize any person for "odd" or "nervous" behavior. And such observations do not provide the specific and articulable facts required here—especially because the most objective factor (medical screening) raised no concerns.

9

only to "the facts available to the officer at the moment of the seizure"). But even limiting the analysis to Wahl's own testimony, nothing suggests that Wahl had any specific facts indicating it would be dangerous for Fairrow to drive. Wahl spoke with Fairrow while they were waiting for the ambulance. [DN 19 at 40:6]. Wahl described Fairrow as "nervous" during this conversation, but used no adjectives suggesting diminished medical capacity. [*Id*. at 40:6; 40:11; 43:21]. When Wahl jumped through the window to stop Fairrow from leaving, Wahl "still did not really know the state of [Fairrow's] condition." [*Id*. at 41:7–10]. Basically, Wahl *lacked* facts about Fairrow's medical condition. He jumped through the window so he could figure out more. The Fourth Amendment flatly proscribes this shoot-first-ask-questions-later approach. *See United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (acknowledging that "all probable cause determinations" are "fact-dependent and will turn on what the officer knew *at the time he made the stop*" (emphasis in original)).

Wahl's only fact suggesting that Fairrow lacked medical capacity was the initial 911 call. Although a 911 call may establish reasonable suspicion for a stop in certain instances, *see Navarette v. California*, 572 U.S. 393, 398 (2014), the 911 call's reliability had been disproven here: the caller suggested Fairrow was unresponsive, but the firefighters found him responsive and communicative. So, even if Wahl could have seized Fairrow based on reasonable suspicion that he posed a danger to himself or others, *cf. Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) (suggesting probable cause may be required), he lacked that suspicion here.

Despite lacking evidence that Fairrow was not fit to drive, the firefighters wanted Fairrow to stick around so the ambulance could sign off, permitting the firefighters to "move[ ] the liability over to the ambulance." [*Id*. at 31:11–14]. At first, Fairrow complied. But he got anxious when he heard law enforcement was en route, and he decided to take off when the officers arrived. [*Id*.

at 31:15–18; 40:6–11]. And objectively, the firefighters had no basis to stop him. No specific and articulable facts substantiated the initial phone call claiming that Fairrow was unresponsive. The facts suggested the opposite. He was responsive, passed the medical screening, and indicated he was fine to drive.

These facts render this case a far cry from *United States v. Overton*, the most relevant Sixth Circuit precedent. 600 F. App'x 303, 310 (6th Cir. 2014). In *Overton*, the court held there was no unreasonable seizure when EMS personnel detained a man, who had been unconscious when they arrived on scene, for thirty seconds out of concern for his medical wellbeing. *Id*. at 310–311. The brief seizure to substantiate the man's claims that he was fine was reasonable in furtherance of their medical duties. *Id*. To analogize, a brief seizure here may have been reasonable if the firefighters found Fairrow unconscious, if Fairrow was slurring words, or if they had other specific concerns about Fairrow's medical capacity. But unlike the EMTs in *Overton*, the firefighters had no reason to question Fairrow's medical capacity. Fairrow was never unconscious, passed the medical screening, and repeatedly said he was fine, yet Wahl aggressively prevented his departure.

Wahl's seizure of Fairrow in the exercise of a community caretaking function was not reasonable because it was not based on specific and articulable facts suggesting Fairrow was a danger to himself or others. For this reason, the Fourth Amendment renders Wahl's seizure unreasonable.

### C. Exclusionary Rule

To address violations of the Fourth Amendment, "the Supreme Court established an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011) (internal citations omitted). "[T]he abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Herring v. United States*, 555 U.S. 135, 143 (2009). "Exclusion is 'not a

personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). "The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236–237. In fact, as noted by the Supreme Court, exclusion should be the "last resort, not [the] first impulse." *Herring*, 555 U.S. at 140. Thus, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009); *see also Illinois v. Gates*, 462 U.S. 213, 223 (1983); *United States v. Scott*, 404 F. Supp. 3d 1095, 1107 (E.D. Ky. 2019).

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

> [T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way.

*United States v. Moorehead*, 912 F.3d 963, 967 (6th Cir. 2019) (quoting *Davis*, 564 U.S. at 238). In other words, "'evidence should be suppressed *only* if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Buford*, 632 F.3d at 270–71 (quoting *Herring*, 555 U.S. at 140). The Court must now decide whether the exclusionary rule requires the suppression of the methamphetamine and firearm—fruits of the unconstitutional seizure of

Fairrow.[5]

### 1. Culpable Conduct

The United States argues that Wahl acted in objectively reasonable reliance that his actions were legal because any firefighter faced with a potentially intoxicated driver at risk of hitting people with his car would have taken the action that Wahl did. The United States points to Wahl's testimony that he entered Fairrow's car to prevent him from leaving out of concern for everyone's safety—the firefighters, the bystanders, even Fairrow himself. [DN 29 at 3–4]. The United States maintains that Wahl did not act in a flagrant, deliberate, reckless, or grossly negligent manner to deprive Fairrow of his Fourth Amendment rights as displayed in Supreme Court cases such as *Weeks v. United States*, 232 U.S. 383 (1914) (police broke into defendant's home without a search warrant and confiscated papers) and *Mapp v. Ohio*, 367 U.S. 643, 644–45 (1961) (police broke into defendant's home, waved a false warrant, prevented lawyer from entering home, and handcuffed defendant).

Based upon a review of the facts and circumstances, the Court disagrees with the United States. This is not an instance where Wahl acted with an "objectively reasonable good-faith belief that [his] conduct [was] lawful" or where his "conduct involves only simple, isolated negligence." *Davis*, 564 U.S. at 238 (2011); *see also United States v. Blackaby*, No. 17-CR-5, 2018 WL 824495,

---

[5] The police officers' search, not Wahl's seizure, discovered the methamphetamine and firearm. And the police officers committed no independent Fourth Amendment violations once they arrived. They walked into a chaotic scene: Wahl's feet were hanging out the window of Fairrow's vehicle, the vehicle jerking back and forth as Wahl and Fairrow wrestled for control over the gear shift. Because of this chaos, the police officers reasonably exercised their community caretaking duties when they rushed over, entered Fairrow's vehicle, and shut it off to abate the dangerous situation. The officers smelled marijuana while in the vehicle, which gave them probable cause to search. *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) ("[W]hen the officers detected the smell of marijuana coming from [defendant]'s vehicle, this provided them with probable cause to search the vehicle without a search warrant."). The search revealed the methamphetamine and firearm. Although the officers' actions did not independently violate the Fourth Amendment, their discovery flowed directly from Wahl's illegal seizure. But for Wahl diving into the window, Fairrow would have driven away. Thus, the evidence was "derivatively obtain[ed] from [the] unconstitutional . . . seizure." *United States v. Pierce*, 531 F.3d 374, 381 (6th Cir. 2008).

at *13 (E.D. Ky. Feb. 12, 2018). Despite the fact that Wahl is not a police officer, Wahl is charged with the knowledge of the contours of the Fourth Amendment just as a reasonable law enforcement officer. *Michigan v. Tyler*, 436 U.S. 499, 504–06 (1978) ("there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman"); *United States v. Rohrig*, 98 F.3d 1506, 1512 (6th Cir. 1996). As discussed more fully above, the record reflects that Wahl lacked any knowledge about Fairrow's medical condition to indicate that Fairrow would be dangerous to drive or that the firefighters near the vehicle were in danger of being immediately hit. Furthermore, a reasonably well trained officer would have known that the seizure of Fairrow without specific and articulable facts suggesting he was a danger to himself or others was unconstitutional. Just because Wahl believed he could legally seize Fairrow does not mean that his conduct was objectively reasonable or simply negligent. Wahl's action was deliberate and at the very least grossly negligent and ultimately violated the Fourth Amendment.

### 2. Deterrence and Social Cost

The United States argues that excluding the evidence from Fairrow's vehicle will not deter future conduct like that exhibited by Wahl. Instead, the United States maintains that suppression would have the social costs (1) of hampering the ability of first responders to do their jobs and keeping people safe and (2) of throwing out reliable evidence against Fairrow including drugs, paraphernalia, a gun, and cash and, as a result, setting a criminal loose in the community without punishment. [DN 29 at 5–6]. The United States contends that such social cost of exclusion of evidence has been deemed unacceptable by the Sixth Circuit. *See, e.g., United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018); *United States v. Reed*, 993 F.3d 441, 446 (6th Cir. 2021).

Contrary to the argument of the United States, the Court finds that the misconduct that led to the discovery of the incriminating evidence—Wahl's seizure of Fairrow—is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010). Application of the exclusionary rule will deter similar unconstitutional conduct not only by police officers, but also by first responders who are acting in an official capacity for a government entity. If firefighters are going to seize individuals under the community caretaker function, the legal parameters of that function should be understood by those officers and firefighters. Furthermore, because Wahl's conduct was deliberate, the deterrence value of exclusion of evidence outweighs the steep social costs.

The United States' reliance on *McCoy* and *Reed* is misplaced. Those cases involve searches conducted pursuant to a warrant later deemed invalid where the mistake occurred because of a *judicial officer*, and the question before the Sixth Circuit was whether the law enforcement officers who executed the search warrant reasonably relied on the warrant signed by the judicial officer. No deterrence value in excluding the evidence existed because the law enforcement officers possessed no culpability but relied on a what appeared to be a valid search warrant. In contrast, here, the mistake occurred because of the *firefighter's* unlawful seizure of an individual. The deterrent effect is directed at law enforcement officers and first responders faced with similar facts or involved in similar conduct.

Therefore, all of the evidence discovered in Fairrow's vehicle must be excluded, and Defendant's Motion to Suppress is granted.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion to

Suppress Evidence [DN 16] is **GRANTED**.  All evidence obtained from the June 25, 2020 search of Defendant's vehicle is suppressed.

Joseph H. McKinley Jr., Senior Judge
United States District Court

November 2, 2021

cc: Counsel of Record